Capital Service, Inc. v. Commissioner.
Capital Serv. v. Commissioner
Docket No. 13562.
United States Tax Court
1949 Tax Ct. Memo LEXIS 192; 8 T.C.M. (CCH) 459; T.C.M. (RIA) 49112; May 10, 1949
*192 1. In 1936 and 1937 petitioner invested in stock of, and made loans to, Central California Utilities Corporation. On its consolidated return for 1942 petitioner claimed the stock investment and the indebtedness as deductions upon the ground of worthlessness, resulting in a net operating loss for 1942 and a net operating loss carry-over to 1943. Respondent determined that the debt and the stock investment became worthless prior to 1942 and denied the claimed 1942 net operating loss carry-over as a deduction for 1943. Held, the stock investment and the indebtedness became worthless prior to January 1, 1942, and petitioner is not entitled to deduct in 1943 a net operating loss carry-over from 1942. 2. In 1941 petitioner filed a separate return which showed a net operating loss. In 1943 petitioner and its subsidiary filed a consolidated return. None of the income reported on the 1943 consolidated return represented income of the petitioner. Held, petitioner is not entitled to carry over its 1941 net operating loss (a separate return year) and deduct it from 1943 consolidated income, a year in which it had no income. Charles M. Walker, Esq., and James L. Wood, Esq., for the petitioner. *193 R. E. Maiden, Jr., Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: This case involves an income tax deficiency for the calendar year 1943 in the sum of $7,358.10. The principal issue is whether petitioner is entitled to a net operating loss deduction in 1943, representing a net operating loss carry-over from the calendar year 1942. In computing its net operating loss for 1942 petitioner deducted $31,567.81 as an alleged bad debt of, and $1,300 as an alleged loss on capital stock of, Central California Utilities Corporation. Respondent disallowed both deductions for 1942 and determined that petitioner had net income instead of a net operating loss carryover for the latter year. The other issue involved herein is whether petitioner can carry over a 1941 net operating loss of $2,752.49, a year for which it filed a separate return, and deduct the loss in 1943, a year for which it filed a consolidated return. From the oral testimony, the documentary evidence, and the partially stipulated facts we make the following Findings of Fact Petitioner is a California corporation, formed April 23, 1936. For the calendar years 1942 and 1943 it filed consolidated *194 returns with the collector for the sixth district of California. Petitioner's subsidiary, A. & W. Baking Company (name changed to Danish Maid Bakery), joined in filing the consolidated returns. For 1940 and 1941 petitioner and its subsidiary each filed an income tax return. In 1940 the subsidiary sustained a net operating loss of $17,846.84; petitioner sustained a net operating loss of $7,082.40 for the same year. In 1941 the subsidiary sustained a net operating loss of $8,681.99; for the same year petitioner sustained a net operating loss of $2,752.49. In the 1942 consolidated return the subsidiary had a net income of $5,685.22, exclusive of a net operating loss deduction; petitioner reported a net operating loss of $27,492.98 for 1942. In arriving at said loss petitioner deducted, upon the grounds of worthlessness: (1) an indebtedness of $31,567.81 owed to it by Central California Utilities Corporation; and (2) $1,300 representing the adjusted basis to it of 1,050 shares of stock of Central California Utilities Corporation. In the notice of deficiency herein respondent disallowed said deductions, totaling $32,867.81, and determined that, with $4,103.53 of deductions not claimed *195 by petitioner but allowed by respondent, petitioner had an adjusted net income for 1942 of $1,271.30, excluding net operating loss deductions. None of the income reported on the 1943 consolidated return of petitioner and its subsidiary, in the amount of $122,566.32, represented income of the petitioner. Adjustments by respondent for 1943 resulted in his determination that the consolidated net income adjusted for 1943 was $25,196.55 instead of the net loss of $23,012.20 reported on the consolidated return. Central California Utilities Corporation, hereinafter referred to as Central, is a California corporation, formed August 3, 1936, for the purpose of taking over the assets and liabilities of the Inland Public Service Company, hereinafter referred to as Inland. Continuously after some time in 1933, and prior to the formation of Central in 1936, Inland owned all the issued and outstanding stock of Gas Fuel Service Company and Kettleman Lakeview Oil and Gas Co. Ltd., hereinafter referred to as Fuel and Kettleman, respectively. The primary function of Kettleman was to own producing wells and leases upon which such wells could be drilled, and to produce gas for sale. The primary purpose *196 of Fuel was to buy gas from Kettleman and others and distribute it for sale to customers in Kings and Fresno Counties, California. All of the issued and outstanding shares of Fuel and Kettleman were acquired by Central from Inland on or about September 5, 1936. At all times material hereto such shares were the sole assets owned by Central. The certificate of dissolution of Inland was filed with the California Secretary of State on March 10, 1937. The early history of Fuel and Kettleman is partially revealed by Decision 26178 of the Railroad Commission of California, 38 C.R.C. 875. It appears therein that on January 23, 1933, Fuel asked the Commission for an order certifying that "public convenience and necessity require and will require the construction and operation of a natural gas transmission and distribution system for the service of natural gas to the agricultural power users in Fresno and Kings Counties and to exercise franchise rights which it contemplates acquiring from said counties." Three other companies resisted Fuel's application and a series of public hearings were held by the Commission. The Commission's decision shows that in or about 1930 the organizers of Fuel owned *197 approximately 1,500 acres of potential oil and gas lands in the Dudley Ridge area of Kings County; that these owners organized Kettleman for the development of their properties; that at the time of the hearings (April and May 1933) three producing gas wells were on the properties, which witnesses estimated had a daily production of 20,000,000 cubic feet over a period of 20 years; that Fuel sold under contract to Pacific Gas and Electric Company 1,000,000 cubic feet of gas per day and small quantities of gas to others in the vicinity of the wells; that a survey of farmers of Kings and Fresno Counties made to secure new outlets for its surplus gas production, indicated approximately 81 potential gas users who would secure an over-all saving of one-third to one-half of their present costs; that Fuel proposed to sell gas at 16 cents per 1,000 cubic feet in Kings County and at 17 cents per 1,000 cubic feet in Fresno County; that such rates were much lower than the rates of the opposing companies; that Fuel would be farmer owned, controlled and managed; and that the estimated cost of installing its proposed transmission and distribution lines vas approximately $680,861. The Commission granted *198 Fuel's request and denied the requests of the resisting companies on July 21, 1933. During May 1933, Kings and Fresno Counties each granted Fuel a franchise by ordinances, which ordinances have never been repealed. Each franchise gave Fuel the non-exclusive right and privilege of using the County's streets, highways and alleys for the purpose of laying and maintaining a gas distribution line. Each franchise required work to commence thereunder within four months or the franchise "shall be declared forfeit." Each franchise required Fuel, or its assigns, to pay the County after the fifth year, two per cent of the gross annual receipts arising from the use of the franchise. Under date of August 28, 1933 the Railroad Commission of the State of California granted Fuel a certificate of public convenience and necessity "* * * authorizing said utility to exercise the rights and privileges granted to it under Ordinance No. 151 of the County of Kings and Ordinance 290 of the County of Fresno, provided that the Commission may hereafter, by appropriate proceedings and orders revoke or limit, as to territory not then served by Gas Fuel Service Company, or its successors in interest, the authority *199 herein granted." Following receipt of its certificate Fuel laid approximately 32 miles of gas line in Kings County. Thereafter it distributed gas procured from Kettleman to its customers. Early in 1935 Kettleman's only gas well blew out depriving Fuel of its gas supply. At the time Fuel lost its gas supply it was serving 10 or 12 customers. By December 31, 1935 Inland was in financial difficulties. The combined book assets of Inland, Fuel and Kettleman as of that date showed current assets of $1,800 and current liabilities in excess of $60,000. Other assets of the companies were valued on their books at December 31, 1935 as follows: pipe lines, $44,740.78; meters and regulators, $354.56; general office equipment, $463.98; miscellaneous equipment, $407.55; lands and leases, $901,112.50; and wells, $200,000. Subsequently, and as of December 31, 1935, the book values of lands, leases and wells were eliminated by quit-claims and abandonment. Late in 1935 or early in 1936 one of the promoters of Inland approached Ralph W. Moore seeking financial aid. Moore investigated Inland's condition and its prospects. His investigations convinced him that if Inland was reorganized and financed, it *200 could become a very profitable operation. He found that Fresno and Kings Counties offered a practically unlimited market and that ample gas supplies appeared to be available within the area served by Fuel or in nearby areas. He located three gas wells that could be purchased or leased, which, on the basis of prior production, would provide an ample supply of gas. Two of the wells had been plugged with cement and one had been capped. Oil companies operating in or near Kings and Fresno Counties had had to shut down their gas wells because the Pacific Gas and Electric Company had ceased purchasing gas in the area, and Moore considered the shut down wells as a further source of supply. He became quite optimistic over Fuel's prospects and succeeded in getting G. Brashears and Company, a Los Angeles firm engaged in selling securities, to put up $20,000 to enable Inland to resume operations. G. Brashears and Company will hereinafter be referred to as Brashears. Moore and Brashears agreed that, after Inland's business was restored to an operating basis, a new company (Central) would be organized to acquire Inland's assets and liabilities. The plan of reorganization contemplated that petitioner *201 would advance the monty needed for the Inland project. Such sums as Moore and Brashears advanced temporarily were repaid by the petitioner. Under the plan of reorganization Moore and Brashears were to have a 25 per cent interest and a 75 per cent interest, respectively, in the promotion stock, Inland stockholders were to receive stock of the new company (Central) and the remaining shares of the authorized issue were to be held for possible future sale to the public. The promotional stock represented over 50 per cent of the shares entitled to vote. Such stock had no cost basis in petitioner's hands. Since some time in 1936 petitioner has owned 1,050 shares of Central's capital stock, which has an adjusted cost basis of $1,300. After Central was organized and during 1936 petitioner made cash advances to or for its benefit totaling $25,561.71, which included sums advanced by Moore and Brashears. Credits to this account during 1936 totaled $5,311.71, leaving a balance due petitioner on January 1, 1937 of $20,250. During 1937 additional cash advances were made to Central by petitioner in the aggregate amount of $14,000. Except for a $50 advance on January 24, 1938, no further loans were *202 made by petitioner to Central. The amount of Central's indebtedness to petitioner at January 31, 1938 was $34,300. Credits to the account of $1,900 on June 3, 1938 and $832.19 on April 30, 1940 reduced the indebtedness to $31,567.81, as of April 30, 1940, which was the amount finally charged off petitioner's books as a loss on December 31, 1942. The funds advanced by petitioner to Central enabled its subsidiary, Fuel, to resume operation of its gas distributing system. A portion of the funds were used by Kettleman in an unsuccessful attempt to bring in its own gas wells, after which it obtained a supply of gas from a nearby capped gas well. This supply was ample for the limited number of customers then being served by Fuel. On or about May 29, 1937 this well was destroyed by geophysical tests conducted by Shell Oil Company in nearby territory. On or about July 21, 1937 Fuel contracted for a supply of gas from Southern California Gas Company. Fuel's contract with Southern was terminated on or about November 11, 1937, because Fuel failed to pay for the gas. At that time Fuel's gas bills exceeded $1,100 and its bills were unpaid since the middle of August. At no time thereafter did Fuel *203 operate its gas distribution system. At the time Fuel ceased operating its gas system it had about 10 customers. In November 1937 Fuel applied to the Railroad Commission of California for permission to temporarily discontinue its service in Kings County. Permission was granted by the Commission on January 3, 1938. In its opinion the Commission pointed out that the tremendous line losses sustained by Fuel [1] "is entirely inexcusable and indicates gross inefficiency on the part of the applicant in the maintenance of its facilities." Fuel was ordered to complete repairs to its lines and facilities as soon as possible and to file progress reports with the Commission at the end of each 30 days. Fuel estimated that the repairs could be made in from 60 to 120 days at a cost of $2,000. Fuel notified Shell Oil Company, by letter dated June 2, 1937, of the destruction of its gas supply by the acts of the latter's employees and demanded satisfaction from Shell. *204 The extent and the nature of the negotiations with Shell are undisclosed but petitioner's account with Central shows a credit of $1,900 on the latter's indebtedness under date of June 3, 1938 which represented an amount received in settlement of Fuel's controversy with Shell. No attempt was made by Fuel to repair its gas distribution system. Floods in 1938 further damaged the lines with the result that in 1939 Fuel sold the pipe and all of its other physical assets. It sold its pipe lines for about $2,500, the purchaser agreeing to pay Fuel's taxes and turn over the receipted tax bill with his check for the difference. Central's account with petitioner shows that the difference amounted to $832.19 which was credited on petitioner's books, April 30, 1940. Fuel turned over its regulators, meters and a Chevrolet truck to one of its employees in satisfaction of unpaid wages. After disposing of these assets Fuel's sole remaining asset was its certificate of public convenience and necessity. By December 1, 1939, Kettleman was without property of any kind whatsoever and never thereafter acquired, owned or held any property. On or about January 6, 1940, the corporate charters of Central, *205 Fuel and Kettleman were suspended by the Secretary of State of California for failure to pay the State franchise tax. At all times thereafter these charters were suspended. Negotiations looking forward to securing a supply of gas for Fuel were conducted by Moore with various individuals and oil companies during 1937 and thereafter. Moore's early negotiations were based upon the purchaser supplying the gas only; his later negotiations were based upon the purchaser supplying the gas and a new pipe line system for distribution. By December 31, 1940 all of these negotiations had proved fruitless. On March 25, 1941, and in August, 1941 he wrote letters to two separate individuals seeking unsuccessfully to interest them, their associates, or their clients in the project. During the interim between January 3, 1938, (when Fuel was permitted temporarily to suspend its service) and October 6, 1942, the Railroad Commission repeatedly called upon Fuel to advise it when Fuel would resume service. Fuel or Central gave the Commission various reasons for its failure to resume service to its customers. On October 8, 1938, the Commission was advised that the flooded condition of the land indicated that *206 it would be well into the year 1939 before flood waters receded to a point where customers would require resumption of service for water pumping. In August, 1939, and in June, 1940, the Commission was advised that there was still no demand for gas for water-pumping purposes. On March 17, 1941, the Commission advised Central that if it intended to abandon service in its territory a formal application to the Commission should be made. On March 25, 1941, Central replied that negotiations were under way looking forward to possible resumption of service, but that if the negotiations were not successfully concluded the abandonment of the "franchise" held by Fuel would be taken up with the Commission. From October 15, 1941, to May 22, 1942, inclusive, the Railroad Commission wrote Central at least five letters requesting information about the status of Fuel and when service to its customers would be resumed. On June 9, 1942, the Commission was advised that Fuel "is no longer operating, having been inactive for the past three years." By order dated October 6, 1942, the Railroad Commission revoked Fuel's certificate and referred in its opinion to Fuel's letter of June 9, 1942 as one of the *207 reasons for the revocation. In a letter to Moore on November 22, 1940, the Internal Revenue Agent in charge in Los Angeles stated that certain stockholders of Central had claimed that their stock became worthless in 1939. Moore was requested to "furnish information covering any event which in your opinion rendered the stock worthless. It is noted that the balance sheet of December 31, 1939 shows stock in subsidiaries, $1,124,507.49." In his reply, dated December 2, 1940, Moore stated that the stock value of $1,124,507.49 represented the book value of Fuel and Kettleman, wholly owned subsidiaries; that Central had no assets other than the stock of its subsidiaries; that the subsidiaries had no assets of any nature except the "questionable value of its certificate of public necessity"; that the value thereof was commensurate with whatever profit Fuel "might be able to earn from its operations, all of which now are suspended," and that it was his personal opinion as principal officer of the three corporations "that their stock became practically worthless in the early part of 1939." The income tax returns of Kettleman, Fuel, Central and petitioner for the taxable years 1936 to 1939, inclusive, *208 show losses for each taxable year by each corporation. [2] The income tax returns for 1940 of Kettleman, Fuel and Central each contain the following statement: "Corporation dormant for past two years. No transactions of any nature in 1940. Corporate franchise cancelled for non-payment of state franchise in 1938." Petitioner's income tax returns for 1940 to 1943, inclusive, show losses as follows: 1940
$ 7,082.40
1941
30.50
1942 *
49,198.79
1943 *
23,012.20
During 1937 petitioner invested in two other business enterprises in addition to Central. These investments were in Timm Aircraft Company and Ful-Ton Truck Company. Petitioner disposed of its investment in Timm Aircraft in 1942 at a profit of $5,650. Its investment in Ful-Ton Truck Company evolved eventually into its wholly owned subsidiary, the A. & W. Baking Company, a wholesale bakery. Petitioner continued to finance the Aircraft Company and the Bakery Company after it ceased financing Central. The indebtedness of Central to petitioner and the stock owned by petitioner in Central became worthless prior to January 1, 1942. Opinion *209 The principal question is whether petitioner sustained a net operating loss in 1942. There is no dispute about the deductibility of such a loss in 1943 if in fact a loss was sustained subsequent to January 1, 1942. Whether petitioner had a net operating loss in 1942 depends upon whether an indebtedness of Central became worthless in that year and also whether certain shares of stock of Central became worthless in 1942. Respondent determined that the indebtedness and the stock became worthless prior to 1942. Petitioner contends that the preliminary financing of Central was one of the purposes for which it was organized; that at the time the loans were made such loans had a potential value but no real, liquidating, actual or intrinsic value because the debtor had insufficient assets from which to obtain repayment; that petitioner knew this, but nevertheless made the loan, purely as a business proposition, expecting repayment (and a profit on a large block of Central's promotional stock) only from the revived and expanded activities of the debtor which were to be touched off by the expenditure of the money advanced; that while the loan did not actually touch off the revived and expanded *210 activities as planned, the activities continued to be very much in prospect until war conditions developed in 1942; and, therefore, that at all times prior to 1942 there was a substantial potential value existing in Central's indebtedness and stock. We can not agree with petitioner. The facts show that long prior to 1942 the promoters of Central had given up all real hope of continuing this venture. Their efforts to secure a supply of gas from their own wells failed in or prior to 1937. Their remaining source of supply was destroyed in May, 1937 by the geophysical tests conducted by Shell. Their purchasing agreement with Southern California Gas Company was terminated November 11, 1937 because of failure to pay for the gas purchased since the middle of August, 1937. After November 11, 1937, Central never had a supply of gas for its customers. On January 3, 1938, the Railroad Commission permitted temporary suspension of service to customers upon the representation that repairs to the distribution system could be completed in 60 to 120 days at a cost of $2,000. The repairs were never made. It is reasonable to assume that any intention to make the repairs that might have existed when the *211 representations were made to the Railroad Commission was wiped out with the floods in Fuel's territory in 1938. Instead of making repairs to its distribution system, Fuel disposed of its pipe line and other physical assets. By the end of 1939 Fuel had no assets except its certificate of public convenience and necessity, and Kettleman had no assets whatever. On January 6, 1940 the corporate charters of Fuel, Kettleman and Central were suspended and never thereafter revived. At January 31, 1940, petitioner had an investment in Central of $32,400 in loans and $1,300 in stock. Central held as its sole assets the capital stock of Fuel and Kettleman. The latter corporations had as their sole asset the certificate owned by Fuel. The charters of all three corporations were suspended and losses had been sustained each year of operation. Before gas service could be resumed a new distribution system had to be purchased and installed and a supply of gas obtained. A new distribution system would have required an outlay of funds greatly in excess of the estimated cost of repairs or the accumulated gas bills on Fuel's purchasing agreement, both of which petitioner refused to finance. The testimony *212 indicates that petitioner preferred to finance its other enterprises because the opportunities for profit were much better. Thus it appears that at least by April 30, 1940, petitioner had made its election and that the Central project was abandoned in so far as any additional investment of funds was concerned. It is clear too that by the end of 1940 all negotiations for disposition of the certificate had failed. The so-called negotiations in 1941 were nothing more than feelers to see if any interest could be aroused. The potential value which petitioner contends continued to exist until revocation of the certificate in October, 1942 was nothing more than wishful thinking. The certificate could have been revoked at any time subsequent to 1939. [3] One of the promoters of the project had already expressed the opinion in writing on December 2, 1940 that the stock of Central "became practically worthless in the early part of 1939." If the stock was practically worthless early in 1939 the indebtedness of Central to petitioner must have also been worthless. Certainly by the end of 1940 petitioner had nothing upon which to rely except the faint hope that some financial "angel" would purchase *213 the certificate for at least $32,867.81 ($31,567.81 plus $1,300). We can not believe that the ordinary prudent man would have considered the indebtedness or the stock investment as having value at January 1, 1942. On this issue we affirm the respondent. In so deciding we have considered the authorities cited in the respective briefs. But, since this case must be decided, in the last analysis, upon its own particular facts, we have not relied upon any decided case, electing instead to base our decision upon the findings of fact hereinabove set forth, which were made after carefully weighing the evidence in the light *214 of the findings requested by both parties. The remaining issue is whether petitioner can carry over a 1941 net operating loss and deduct it from its 1943 consolidated net income. Petitioner filed a separate return in 1941, and it had no income in 1943 which was included in the consolidated return filed for 1943. Under such circumstances section 23.31 (d) (3) of Regulations 104 provides that the net operating loss carry-over from a separate return year shall not exceed the sum of the corporate net income included in the consolidated net income tax year plus separate net capital gain of the consolidated income tax year. The stipulated facts show that petitioner had no net income for 1943 so that the limitation contained in the regulations, which petitioner accepted by filing the consolidated return, prevents any part of the 1941 net operating loss from being carried over as a deduction against 1943 consolidated net income. On this issue, too, we sustain the respondent. Decision will be entered for the respondent. Footnotes
1. Fuel showed the Commission that it purchased 2,614,000 cubic feet of gas from Southern California Gas Company during October, 1937, while sales to its customers totaled 422,341 cubiic feet, the difference being attributed to line losses.↩
2. No tax return for Kettleman for 1937 was placed in evidence.↩
*. Consolidated return filed with A. & W. Baking Company.↩
3. Fuel was granted the certificate upon its representation that it would construct and operate a gas distributing system. The Railroad Commission expressly reserved, however, the right to revoke or limit the authorization as to territory not being served. Fuel ceased serving its customers November 11, 1937. It secured a temporary suspension of service on January 3, 1938 to complete within 60 to 120 days repairs to its pipe lines. Instead of making the repairs, Fuel sold its pipe line system and by the end of 1939 had no facilities whatsoever with which to serve its territory.↩